George R. KNIPPEN, Appellant,

v.

FORD MOTOR COMPANY, et al.

George R. KNIPPEN

v.

FORD MOTOR COMPANY, Appellant,

and

Winifrede B. DeWeese.

Nos. 75–1892, 75–2049.

United States Court of Appeals, District of Columbia Circuit.

Argued May 19, 1976.

Decided Nov. 8, 1976.

Paul Martin Wolff, Washington, D.C., with whom David N. Webster and William W. Graham, Washington, D.C., were on the brief for George R. Knippen.

Frank J. Martell, Washington, D.C., for Ford Motor Co.

Before BAZELON, Chief Judge, TAMM, Circuit Judge and CHRISTENSEN,* United States Senior District Judge for the District of Utah.

Opinion for the Court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

The issues presented in these consolidated appeals arise out of an automobile accident in which George R. Knippen (Knippen) was struck by a 1968 Mercury station wagon manufactured by Ford Motor Company (Ford). After a full trial Judge Robinson entered a judgment against Ford on the jury's special verdict that Ford had breached its duty to design a vehicle which protects against unreasonable risk of injury and had proximately caused enhancement of Knippen's injuries. Ford's three pronged attack on this judgment alleges that the trial court erred in: 1) holding that Ford owed Knippen a duty to avoid unreasonably dangerous features in its automotive designs which may enhance the injuries received in a highway collision even though the collision itself is not caused by the vehicle's design, 2) finding that Knippen was not guilty of contributory negligence as a matter of law, and 3) refusing to admit into evidence photographs of automobiles other than 1968 Mercury station wagons which had been offered to show that Knippen would have suffered the same injuries in collisions with other vehicles. Knippen cross-appeals alleging error in the trial court's award of a directed verdict denying his punitive damages claim against Ford. Our examination of the record and the law leads us to the conclusion that Judge Robinson ruled correctly on each of the issues raised by the parties and consequently we affirm the judgment of the district court.

On March 28, 1970 Knippen was riding north on his motorbike. A 1968 Mercury station wagon approached him from the opposite direction and attempted to turn left across his lane. Knippen was struck by the left front of the automobile and as a result suffered very serious injuries including severe tearing away of the muscles and soft tissue in his lower left leg. Knippen filed suit in the United States District Court for the District of Columbia against Ford and the driver of the 1968 Mercury station wagon which had struck him. He filed a separate action against the owner of the station wagon. These actions were consolidated and tried together before a jury. The trial court granted Ford a directed verdict denying Knippen's claim for punitive damages and submitted the case to the jury. The jury, in answer to special interrogatories, found that the driver's negligence had proximately caused Knippen's injuries and that Ford had been negligent in the design of its 1968 Mercury station wagon and thereby proximately caused the enhancement of Knippen's injuries. The trial court entered judgment against the driver and owner for $300,000 of which Ford was ordered to pay $250,000. Ford's motion for a judgment notwithstanding the verdict or alternatively for a new trial was denied. These appeals followed.

Knippen's leg injury was due in large part to contact with a sharply pointed triangular metal projection behind the plastic lens hood of the 1968 Mercury's turning signal and parking light assembly. The turning signal bulb and parking light bulb on this model are located vertically one above the other at the outside edge of the front fender. These bulbs must be separated by an opaque or reflective divider so that the parking light does not obscure the turning signal. Ford met this functional requirement with a rigid metal divider in the shape of an isosceles triangle with its base firmly attached to the body of the car and its tip extending four inches out to the inside edge of the plastic lens hood which covers the entire turning signal and parking light assembly.

## I. SCOPE OF MANUFACTURER'S DUTY

Ford argues that as a matter of law it cannot be liable to Knippen because a manufacturer of a motor vehicle owes a duty

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

only to those injured through the use of its vehicle for its intended purpose. Ford reasons that injuries arising from highway collisions which are not caused by any defect in the vehicle are remote possibilities for which manufacturers should never be liable. Ford relies on language in *Jamieson v. Woodward & Lothrop*, 101 U.S.App.D.C. 32, 247 F.2d 23, *cert. denied*, 335 U.S. 855, 78 S.Ct. 84, 2 L.Ed.2d 63 (1957) to support its contention that this is the law in the District of Columbia.

> [S]o far as foreseeability is concerned, not only may the usual be foreseen, but the unusual may often be foreseen as a remote possibility. A manufacturer may foresee as a remote possibility that a metal decoration on a jewelry box may scratch one and cause an infection; the heel of a lady's shoe may break . . . causing serious injury; or that a stickpin may stab a man to the heart. Yet for these remote eventualities the law imposes no liability on the manufacturer. "Reasonably foreseeable" . . . does not encompass the far reaches of pessimistic imagination.

*Id.* at 29 (footnotes omitted).

*Jamieson*, however, is both factually and legally distinct from the case presently before us. *Jamieson* held that a manufacturer of a rubber exercise rope was not liable for the injury caused by the rope when it slipped off the soles of the user's feet and snapped into her eye while she was exercising. The court specifically noted that the case did not raise the issue of negligent design but rested on the manufacturer's alleged negligence in failing to warn the purchaser of the elastic characteristics of the rope. *Id.* at 25. Moreover, although the *Jamieson* opinion at times speaks in terms of "no duty" the holding of the case can easily be explained as a finding that the manufacturer acted as a reasonable person and discharged any duty that it had. We cannot say that the *Jamieson* conclusion that a manufacturer does not have to warn users that "if an elastic band . . . is stretched and .ʙ . . slips, the elastic snaps back," *id.* at 28, settles the question of whether an automobile manufacturer has a duty to design its product to avoid unreasonably dangerous features that may enhance injuries in a collision.

Knippen cites five decisions from this court to counter Ford's statement of the law in the District of Columbia and argues that they establish the broad principle that reasonably foreseeable negligence does not relieve a defendant of liability. *Becker v. Colonial Parking, Inc.*, 133 U.S.App.D.C. 213, 409 F.2d 1130, 1136 (1969); *Kendall v. Gore Properties, Inc.*, 98 U.S.App.D.C. 378, 236 F.2d 673 (1956); *Hecht Co. v. Jacobsen*, 86 U.S.App.D.C. 81, 180 F.2d 13 (1950); *Howard v. Swagart*, 82 U.S.App.D.C. 147, 161 F.2d 651 (1947); *Ross v. Hartman*, 78 U.S.App.D.C. 217, 139 F.2d 14, *cert. denied*, 321 U.S. 790, 64 S.Ct. 790, 88 L.Ed. 1080 (1943). Like *Jamieson* each of these cases is distinguishable on the facts;[1] none addresses the question of an automobile manufacturer's liability for enhanced injuries when its negligent design has not caused the accident.

---

1. *Becker v. Colonial Parking, Inc.*, 133 U.S.App.D.C. 213, 409 F.2d 1130 (1969) imposed liability on the owner of a parking lot for injuries to two patrons from the negligence of a third patron attempting to extricate his car from its parking spot. *Kendall v. Gore Properties, Inc.*, 98 U.S.App.D.C. 378, 236 F.2d 673, 682 (1956) held that in an action for wrongful death of a tenant against her landlord and resident manager, the fact that the direct cause of death was a criminal act does not take the issue of proximate cause away from the jury. In *Hecht Co. v. Jacobsen*, 86 U.S.App.D.C.81, 180 F.2d 13, 16 (1950) the court rejected a department store's claim that a mother's failure to supervise her child broke the chain of causation in an action for injuries to the child who had caught her hand in the store's escalator. *Ross v. Hartman*, 78 U.S.App.D.C. 217, 139 F.2d 14, 15, *cert. denied*, 321 U.S. 790, 64 S.Ct. 790, 88 L.Ed. 1080 (1943), reversed a directed verdict and found proximate cause where the defendant's agent had negligently allowed a truck to be driven away by an unknown person who struck and injured the plaintiff. The last of the five cases cited by Knippen, *Howard v. Swagart*, 82 U.S.App.D.C. 147, 161 F.2d 651 (1947) is not only factually distinguishable but also contrary in its holding. The court refused to extend liability to the owner of a car which was stolen and struck the plaintiff while being driven by a person other than the thief. *Id.* at 655.

Our own research has not revealed a case from this jurisdiction which deals dispositively with the issue raised by Ford. A growing number of states and several federal courts, however, have dealt with this issue. The cases can be divided into two contrary lines of authority generally represented by *Evans v. General Motors Corp.*, 359 F.2d 822 (7th Cir. 1966), *cert. denied*, 385 U.S. 836, 87 S.Ct. 83, 17 L.Ed.2d 70 (1967) and *Larsen v. General Motors Corp.*, 391 F.2d 495 (8th Cir. 1968).

In *Evans* the driver of an automobile was killed when the left side of his car collapsed in upon him as it was struck from the side by another vehicle. Plaintiff alleged that the manufacturer had been negligent in using an X-frame design without side frame rails rather than a perimeter frame. The Seventh Circuit affirmed the dismissal of plaintiff's suit and held that a manufacturer does not have a duty to make its automobile "accident-proof". *Evans, supra*, 359 F.2d at 824. The court noted that each case cited by the plaintiff involved a product unfit for its intended use and concluded:

> The intended purpose of an automobile does not include its participation in collisions with other objects, despite the manufacturer's ability to foresee the possibility that such collisions may occur. . . . [A manufacturer] also knows that its automobiles may be driven into bodies of water, but it is not suggested that [a manufacturer] has a duty to equip them with pontoons.

*Id.* at 825.

In *Larsen* the plaintiff alleged that the negligent design of an automobile's steering assembly enhanced the injuries he received in an accident which admittedly was not caused by the vehicle's design. The trial court granted summary judgment for the defendant-manufacturer relying on *Evans*. The Eighth Circuit reversed and after a thorough review of prior case law found that

> [w]here the injuries or enhanced injuries are due to the manufacturer's failure to use reasonable care to avoid . . . an unreasonable risk of injury, general negligence principles should be applicable.

*Larsen, supra*, 391 F.2d at 502. The court rejected a narrow construction of "intended use" as unrealistic, reasoning that while automobiles are not made for the purpose of colliding, accidents are statistically inevitable incidents of normal, expected use. *Id.* In summation the *Larsen* court stated:

> We perceive of [*sic*] no sound reason . . . why the manufacturer should not be held to a reasonable duty of care in the design of its vehicle consonant with the state of the art to minimize the effect of accidents. The manufacturers are not insurers but should be held to a standard of reasonable care . . . .

*Id.* at 503.

Commentators have been critical of the reasoning of *Evans*,[2] but it nonetheless has its judicial adherents. In *Walton v. Chrysler Motor Corp.*, 229 So.2d 568, 570–73 (Miss.1969) the Supreme Court of Mississippi refused to extend its doctrine of strict liability and hold a manufacturer liable for injuries from an accident that was not caused by the defect in its product.[3] In *Alexander v. Seaboard Air Line R.R.*, 346 F.Supp. 320, 327 (W.D.N.C.1971), a federal district court applying North Carolina law adopted the narrow "intended use" rule as did another federal district court in West Virginia. *McClung v. Ford Motor Co.*, 333 F.Supp. 17, 19–20 (S.D.W.Va.1971), *aff'd*, 472 F.2d 240 (4th Cir.), *cert. denied*, 412 U.S. 940, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973).

---

2. *See, e.g.*, W. Prosser, Law of Torts § 96, at 646 (1971); Nader & Page, *Automobile Design and the Judicial Process*, 55 Cal.L.Rev. 645, 656 (1967); Note, *Manufacturer's Liability for an "Uncrashworthy" Automobile*, 52 Cornell L.Rev. 444, 458–59 (1967); 80 Harv.L.Rev. 688, 689 (1967).

3. *Accord General Motors Corp. v. Howard*, 244 So.2d 726, 729 (Miss.1971); *Ford Motor Co. v. Simpson*, 233 So.2d 797, 798–99 (Miss.1970). *But see Williams v. Cessna Aircraft Corp.*, 376 F.Supp. 603, 605–07 (N.D.Miss.1974); Maraist & Barksdale, *Mississippi Products Liability—A Critical Analysis*, 43 Miss.L.J. 139, 180 n.200 (1972).

The modern trend of the case law[4] and increasingly the weight of authority[5] favors *Larsen's* extended scope of liability. The choice between these two rules is not a numbers game, however. We must carefully weigh the policies which underlie each rule and the implications which flow from them. Deciding whether to impose a duty requires courts to weigh the benefit of reducing injuries against the costs to removing the danger.[6]

The reluctance of the *Evans* court and those following it to extend a manufacturer's duty beyond "intended use" is based on two interrelated reasons. First, these courts argue that without the "intended use" limit manufacturers will always and sometimes unfairly be held liable for injuries from any design feature for which a resourceful plaintiff can suggest a safer design. *Evans* reasoned that "[a] manufacturer is not under a duty to make his automobile accident-proof . . . ." *Evans, supra,* 359 F.2d at 824. In *Walton, supra,* 229 So.2d at 573, the court noted that under the applicable strict liability theory negligence is not a required element of the plaintiff's case. The manufacturer could not escape liability by proving that he exercised even the highest degree of care. In such a situation the court apparently concluded that following *Larsen* would make automobile manufacturers insurers against all accidental injuries arising from the use of their product. *Id.* at 572.

In *Yetter v. Rajeski,* 364 F.Supp. 105, 108 (D.N.J.1973) a federal district court decided that New Jersey courts would follow *Evans* reasoning that it would be unfair to impose a duty on an automobile manufacturer to design a collapsible steering assembly capable of absorbing enough energy to avoid fatal injuries in a front end collision. The court took note that all automobiles of the same model year had rigid steering assemblies and that "[a]ny part . . . can be said—after the fact—to have been capable of 'safer' design." *Id.*

The *Evans* majority and those courts which have followed it are apparently concerned that manufacturers who have produced an automobile which performs its functions without undue hazards would nonetheless be held liable for any injury caused by their product simply because accidents are logically foreseeable. The "intended use" rule deals directly with that concern by automatically insulating manufacturers from all claims by a particular class of plaintiffs. It thus achieves what may be a reasonable level of manufacturer liability, but does so by excluding both reasonable and unreasonable claims. Regardless of how grossly unreasonable a manufacturer's conduct is under the circumstances, it can escape liability under the "intended use" rule by showing no more than that the accident leading up to plaintiff's injury was not caused by its product. The rule arises from a concern for fairness but is not focused on fairness. It does not consider the reasonableness of a manufacturer's conduct but only the position of a plaintiff's injury in the chain of causation.

Moreover, the concern for unfairness which has led courts to follow *Evans* arises from a misreading of the rule of liability established by *Larsen*. The majority opinion in *Larsen* agreed that "an automobile manufacturer is under no duty to design an accident-proof" car, but did not find that that principle excused manufacturers from "a duty, to use reasonable care . . . to avoid . . . an unreasonable risk of

---

4. *See, e.g., Rutherford v. Chrysler Motors Corp.,* 60 Mich.App. 392, 231 N.W.2d 413, 417 (1975); *Brandenburger v. Toyota Motor Sales, Inc.,* 162 Mont. 506, 513 P.2d 268 (1973); *Turner v. General Motors Corp.,* 514 S.W.2d 497 (Tex.Civ.App.1974), *writ of error refused.*

5. *See Polk v. Ford Motor Co.,* 529 F.2d 259, 265 n.5 (8th Cir.), *cert. denied,* 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976).

6. *See* Note, *The Automobile Manufacturer's Liability to Pedestrians for Exterior Design: New Dimensions In "Crashworthiness",* 71 Mich.L. Rev. 1654, 1668 (1973).

injury in the event of a collision." *Larsen, supra,* 391 F.2d at 502.

Under the *Larsen* rule manufacturers are not held to the standard of insurers but only to a standard of reasonable care. Manufacturers are not required to eliminate all risks or to produce a crash-proof vehicle. They are required to eliminate unreasonable risks and to take reasonable steps to apply common sense factors to minimize the injurious effects of collisions. This rule is fair to manufacturers. If a manufacturer has acted reasonably it will not be liable under the duty established by *Larsen.* For example, in *Dreisonstok v. Volkswagenwerk, A.G.,* 489 F.2d 1066, 1073 (4th Cir. 1974) the court applied *Larsen* but ordered judgment for a defendant-manufacturer because on "the facts of this particular case, it is clear that there was no violation by defendant of its duty of ordinary care in the design of its vehicle."

■ Those courts which follow *Larsen* emphasize that "unreasonableness" is an essential element of the plaintiff's case. *See, e. g., Dreisonstok, supra,* 489 F.2d at 1071; *Dyson v. General Motors Corp.,* 298 F.Supp. 1064, 1073 (E.D.Pa.1969); *Turner v. General Motors Corp.,* 514 S.W.2d 497, 504 (Tex.Civ. App.1974), *writ of error refused.* Of course in any given case the question of whether a design is unreasonable is a decision for the trier of fact[7] guided by general negligence principles—balancing the likelihood and gravity of harm against the burden of effective precautions. *Dreisonstok, supra,*

489 F.2d at 1071; *Larsen, supra,* 391 F.2d at 502 n.3.

The second and related reason given by courts adopting a narrow scope for a manufacturer's duty of design is that the imposition of design standards is a legislative rather than a judicial function. *Evans, supra,* 359 F.2d at 824; *see Yetter, supra,* 364 F.Supp. at 108. These courts conclude that automobile design safety standards must await action by the legislative branch because the judiciary, acting alone, has no guides from which to fashion a standard of care and no machinery with which to require compliance. *Walton, supra,* 229 So.2d at 573; *see* Henderson, *Judicial Review of Manufacturers Conscious Design Choices: The Limits of Adjudication,* 73 Colum.L. Rev. 1531, 1539–41 (1973). *But see* Twerski, Weinstein, Donaher & Piehler, *The Use and Abuse of Warnings in Products Liability—Design Defect Litigation Comes of Age,* 61 Cornell L.Rev. 495, 524–40 (1976).

■ The argument that restricting a manufacturer's liability for negligent design to injuries arising from "intended use" protects courts from an improper and unworkable foray into legislative functions does not hold up under close analysis. *Evans* itself was decided in April, 1966 as the Congress was considering but had not yet passed the National Traffic and Motor Vehicle Safety Act of 1966, Pub.L. No. 89–563, 80 Stat. 718, *as amended,* 15 U.S.C. §§ 1391–1424 (Supp. V 1975). *See Evans, supra,* 359 F.2d at 828 (Kiley, J., dissenting).

---

**7.** *See* W. Prosser, *supra* note 2, § 37, at 208. Of course the design of an automobile must take into account many factors other than safety. A designer must consider the "utility and purpose of the particular type of vehicle" and the "price range of the market to which it is intended to appeal". Dreisonstok, *supra,* 489 F.2d at 1072–73. Moreover, safety objectives themselves may be at cross purposes. To protect occupants automobiles must have hard outer shells, but when such a vehicle collides with a pedestrian at high speed injury is unavoidable. Note, *supra* note 6, at 1655. On the record before us, however, we cannot say that the jury erred in its finding that Ford had been negligent in the design of its 1968 Mercury station wagon. Knippen introduced expert testimony that the opaque divider in the turning signal and parking light assembly could have

been made out of alternative yielding materials which were available for the 1968 model year. Record at 800–03. Knippen's expert testified that not only was the rigid metal material unnecessary for the function of the divider, but also that safer alternatives would have been less costly. *Id.* at 803. "[I]f an article can be made safer . . . 'by an alternate design . . . at no substantial increase in price', then the manufacturer has a duty to adopt such a design . . . ." Dreisonstok, *supra,* 489 F.2d at 1073; *see* Note, *supra* note 6, at 1655 & n.9. The danger of enhanced injuries from protrusions of this same general character was well known throughout the industry in the 1960's and had been specifically brought to Ford's attention by a letter from the head of the National Highway Safety Board. Record at 487–89.

A court's reluctance to break new ground in an area subject to impending and potentially comprehensive legislation is understandable. The legislation which was passed just a few months after *Evans* explicitly provides, however, that the new law is not intended to "exempt any person from any liability under common law". National Traffic and Motor Vehicle Safety Act of 1966, § 108(c), 15 U.S.C. § 1397(c) (Supp. V 1975). Although a legislative approach to establishing reasonable design standards might have its advantages[8] the general development of products liability law casts doubt on the *Evans* court's notion of the appropriate sphere of judicial action. 80 Harv.L.Rev. 688, 692 & n.26 (1967).

Assuming *arguendo* the correctness of the narrow view of judicial competence implicit in the cases following *Evans,* that view, nevertheless, offers little support for the "intended use" rule.[9] Although the rule greatly reduces the number of potential plaintiffs who may bring a negligent design action against a manufacturer, it by no means frees the courts from the task of dealing with issues of negligent or defective design. There continue to be suits in which an injured party alleges that a manufacturer's negligent or defective design caused an accident.[10] Such cases present the same questions of what standard of care defendants must meet and how courts can police compliance with that standard which the *Walton* court argued are unanswerable without legislative guidance. If the *Evans*

view of narrow judicial competence is valid, it might support a finding of no judicially imposed duty in automobile design whatsoever. It is, however, logically unrelated to a rule which merely limits the number and type of plaintiffs who can claim the benefit of a judicially imposed duty.

*Larsen* relied heavily on the reasoning that although collisions may not be an intended purpose of automobile use they are nonetheless clearly foreseeable at the time of design as "statistically inevitable" events. *Yetter v. Rajeski, supra,* 364 F.Supp. at 108, correctly observes that whether a duty exists is not simply a question of foreseeability.

> [It] is ultimately a question of fairness. . . . [and] involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.

*Id.* quoting *Goldberg v. Housing Authority,* 38 N.J. 578, 583, 186 A.2d 291, 293 (1962). Foreseeability is, nevertheless, an important factor, *Driesonstok, supra,* 489 F.2d at 1070, and the problem of the scope of a duty is often approached in terms of foreseeability. Note, *The Automobile Manufacturer's Liability to Pedestrians for Exterior Design: New Dimensions in "Crashworthiness",* 71 Mich.L.Rev. 1654, 1669 (1973); *see* Restatement (Second) of Torts, § 281, comment c.

The *Larsen* rule is not unfair to manufacturers. They are only subject to liability for unreasonable action. Moreover, the manufacturer-designer is the only party

---

**8.** For example a legislature can authorize an administrative agency to conduct research to develop a better understanding of the engineering complexities involved in design questions. Judges and juries are limited to the understanding they can acquire through expert testimony. Furthermore, standards set by legislation or administrative regulation pursuant to legislative authority can more easily and quickly establish comprehensive, consistent, nationally uniform guidelines. Judicial reform can only proceed on a case-by-case basis. *See* 80 Harv.L.Rev. 688, 692–93 (1967).

**9.** A case wherein plaintiff seeks recovery for enhanced injuries from a negligent design which did not cause the initial impact does raise a complicated question of causation. The trier of fact must separate which injury or how

much of any given injury is attributable to the negligence which caused the collision from how much the plaintiff's injury was enhanced. At least since *Palsgraf v. Long Island R.R.,* 248 N.Y. 339, 162 N.E. 99 (1928) courts have had to deal with complex causal patterns. Moreover, equally difficult apportionment problems are dealt with by the courts in comparative negligence or condemnation cases. *See Larsen, supra,* 391 F.2d at 503.

**10.** *See, e.g., Walsh v. National Seating Co.,* 411 F.Supp. 564 (D.Mass.1976); *Prosky v. National Acme Co.,* 404 F.Supp. 852 (E.D.Mich.1975); *Cardullo v. General Motors Corp.,* 378 F.Supp. 890 (E.D.Pa.1974), *aff'd without opinion,* 511 F.2d 1392 (3d Cir. 1975).

who is in a position to see that unreasonably dangerous features are not incorporated into automobile designs. Many unreasonably dangerous design features are not visible to a purchaser. The metal divider in this case is an excellent illustration. The purchaser or driver of a 1968 Mercury only sees the relatively smooth, breakable plastic hood covering the turning signal and parking light bulbs. She is unlikely to refuse to purchase or drive that model because it presents a danger of enhancing the injuries which she could be held liable for in an accident. The manufacturer's design engineers, in contrast, had to be aware of the physical configuration of the interior of this assembly as part of their job. If that awareness were coupled with a consciousness of potential liability for injuries caused by the metal projection in highway accidents, it seems far more likely that they would have substituted safer, less expensive, functionally equivalent materials. Finally, it is important to note that the jury's verdict in this case does not rest on a conclusion that Ford should have employed a costly special safety design rather than the one it chose. Ford's liability is based simply on its failure to thoughtfully apply commonly known design principles relating to localization of forces and to utilize less costly available alternative materials.

We need consider only one last point on the issue of Ford's duty to Knippen. The facts of *Larsen* and almost all of the cases following it are arguably distinguishable from the case at bar. Knippen was not an occupant of the 1968 Mercury; in fact he had no relationship to it at all until he was struck. Ford refers us to *Kahn v. Chrysler Corp.*, 221 F.Supp. 677 (S.D.Tex.1963) and *Hatch v. Ford Motor Co.*, 163 Cal.App.2d 393, 329 P.2d 605 (1958) which held that an automobile manufacturer is not required to guard against injuries to persons who collide with parked cars. Both *Hatch* and *Kahn* were decided before their respective jurisdictions adopted the *Larsen* rule. *See Cronin v. J.B.E. Olson Corp.*, 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153 (1972) (en banc); *Turner v. General Motors Corp., supra*. Whatever support those cases may previously have offered to Ford's position [11] their continuing validity is dubious.

In *Passwaters v. General Motors Corp.*, 454 F.2d 1270 (8th Cir. 1972) the Eighth Circuit had to decide whether Iowa would apply *Larsen* to a set of facts remarkably similar to the case now before us. The plaintiff had been a passenger on a motorcycle which had collided with an automobile on the highway. Her left leg was severely mangled when it came in contact with unshielded metal flanges on the car's rear wheel cover. The court reversed a directed verdict for the defendant manufacturers and after a thorough review of the relevant authorities concluded:

> We think it now settled that a manufacturer does have the responsibility to avoid design in automobiles which can reasonably be foreseen as initially causing or aggravating serious injury to users of the highway when a collision occurs.

*Id.* at 1276. Our own analysis leads us to the same conclusion and we therefore reject Ford's claim that the question of its liability to Knippen should never have been submitted to the jury.

## II. CONTRIBUTORY NEGLIGENCE AND EXCLUSION OF EVIDENCE

Ford also asserts error by the trial court in refusing to let the issue of contributory

---

**11.** Both *Kahn* and *Hatch* are distinguishable from the case at bar. In *Kahn* the plaintiff was a seven year old boy who had driven his bike into the rear of a parked car. The trial court granted summary judgment for defendant after concluding that Texas law did not impose any duty on the manufacturer with respect to the plaintiff. *Kahn v. Chrysler Corp., supra*, 221 F.Supp. at 678–79. In *Hatch* a six year old had pierced his eye when he ran into the pointed radiator ornament of a parked vehicle. Although the California court dismissed the suit because the manufacturer had no duty to such a plaintiff, it explicitly noted:

> The facts here do not present the question as to whether defendant owed to the public a duty to so design its automobile as to lessen the severity of injuries that might be caused by it if it were negligently operated on the highways . . . .

*Hatch v. Ford Motor Co., supra*, 163 Cal. App.2d at 396, 329 P.2d at 607.

negligence go to the jury and excluding from evidence certain exhibits and testimony offered to support its theory of causation. Neither of these questions require much discussion.

■ Ford argues that Knippen negligently failed to yield the right of way to the 1968 Mercury station wagon turning left across his path. We find no evidence in the record on which the jury could have found Knippen negligent.[12] The station wagon had barely passed the median when its left front fender struck Knippen. According to the evidence, the automobile crossed the median and entered Knippen's path in less time than was necessary for him to take evasive action. Brief for Appellee at 45–46; see Record at 850–55.

■ Ford presented two witnesses attacking the causation element of Knippen's case. They testified extensively that the injury to Knippen's leg was not in fact caused by the divider in the 1968 Mercury's turning signal and parking light assembly. During this testimony the trial court admitted photographs of a 1968 Mercury but excluded photographs of other automobiles. Ford had offered the excluded photographs to show that Knippen could have been seriously injured by automobiles other than its 1968 Mercury. This evidence was addressed only to the issue of causation and was not offered to show the state of the art as was similar evidence in *Dreisonstok, supra,* 489 F.2d at 1075.

Ford's argument that the exclusion of the photographs irreparably damaged its defense is not persuasive. The trial court allowed Ford ample opportunity to fully present its theory of causation to the jury. We cannot say that its decision to exclude photographs of automobiles other than the make which actually struck Knippen was a clear abuse of discretion requiring reversal by this court. See *Frank R. Jelleff, Inc. v.*

*Braden,* 98 U.S.App.D.C. 180, 233 F.2d 671, 680 (1956).

## III. PUNITIVE DAMAGES

Knippen contends that the directed verdict against his punitive damage claim was erroneous because it was based on an incorrect legal standard. The trial court rejected Knippen's argument against Ford's directed verdict motion stating:

> I think what the court said in the Nader and Allegheny Airlines case which just came down is that the tort, in order to support punitive damages, must be aggravated by evil motive, actual malice, deliberate violence or oppression; a deliberate thing: we are going to go out and get as many pedestrians and motorcyclists as we can.

Record at 1228. Knippen concludes from this that the trial court was requiring Knippen to show evidence that Ford intended to cause injury before allowing the issue of punitive damages to go to the jury.

■ Punitive damages are not favored by the law. *Price v. Griffin,* 359 A.2d 582, (D.C.App., 1976). They are awarded to punish and deter outrageous conduct, and the question is whether a defendant's conduct "contains elements of intentional wrongdoing or conscious disregard" for plaintiff's rights. *Nader v. Allegheny Airlines, Inc.,* 168 U.S.App.D.C. 255, 512 F.2d 527, 549–50 (1975), *rev'd on other grounds,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976). Actual malice is not required but defendant must act with such conscious and deliberate disregard of the consequences of his actions to others that his conduct is wanton. W. Prosser, Law of Torts, § 2, at 9–10 (1971).

■ We agree with Knippen that a showing of wanton and reckless disregard for the rights of others will support an award of punitive damages. An examination of

---

12. Knippen contends that even if it could be proven, contributory negligence is not a valid defense in this case since Ford's duty is based on the foreseeable possibility that its automobiles will be involved in highway collisions caused by the negligence of the driver or other highway users. *See also* Note, *supra* note 6, at 1666. In light of our holding that there is no factual basis for a finding of contributory negligence we do not reach this issue and express no opinion as to its merits.

the complete record, however, raises a substantial question as to whether the trial court did not in fact apply that standard. In a colloquy with the court after the directed verdict was granted, Knippen's counsel argued that the issue should be judged on a standard of gross negligence. Record at 1227–30. The court specifically asked whether Knippen was arguing that Ford's design was wanton. *Id.* at 1228. Receiving a negative reply, the court rejected Knippen's gross negligence standard and adhered to its decision. It is well settled that gross negligence will not support punitive damages. *Nader v. Allegheny Airlines, Inc., supra,* 512 F.2d at 549. The most extreme negligence lacks the essential element of conscious indifference to consequences. W. Prosser, *supra,* § 2, at 10.

■ If the trial court did apply an "actual malice" rather than "wanton or reckless" standard we still cannot say that the directed verdict for Ford should be reversed. Viewing all the evidence in the light most favorable to Knippen we cannot find sufficient basis for a jury to find the essential conscious disregard for consequences which is required under a "wanton or reckless" standard. Knippen himself argues that Ford "knew or should have known" that protrusions such as those on its 1968 Mercury posed grave danger to pedestrians and cyclists. Brief for Cross-appellant at 28. That is the language of negligence. However unreasonable Ford's conduct may have been in light of government and industry concern with the injury potential of force localizing protrusions we cannot say that its 1968 Mercury station wagon was designed with conscious disregard of potential injury.

## IV. CONCLUSION

After a careful and extensive review of the precedents we conclude that Judge Robinson was correct in all his rulings. Ford did owe Knippen a duty to exercise ordinary care in the design of its 1968 Mercury station wagon so as to avoid unreasonably dangerous features with the potential of enhancing injuries in highway collisions.

There is no basis in the evidence for finding Knippen contributorily negligent and there was no abuse of discretion in Judge Robinson's exclusion from evidence of photographs of automobiles other than 1968 Mercurys. Finally, we reject Knippen's assertion of error in the award of a directed verdict denying his claim for punitive damages. The judgment of the trial court is therefore affirmed in all respects.

*Affirmed.*